

FILED
5/5/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SHAUNTELLE Y. PRIDGEON

CASE NUMBER: 23CR277

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than January 1, 2017, and continuing until at least August 16, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1343 and 1346 | Devising or participating in a scheme or artifice to defraud, including a scheme or artifice to deprive defendant's employer, the State of Illinois, of the intangible right of honest services, and transmitted or caused to be transmitted by means of wire communication in interstate commerce, for the purpose of executing and in furtherance of such scheme or artifice, an automated clearinghouse electronic funds transfer from the State of Illinois to PROVIDER A for purported childcare services rendered by PROVIDER A, in violation of Title 18, United States Code, Section 1343 and 1346. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

/s/ Brent E. Potter (MDW with permission)

BRENT E. POTTER
Special Agent, Federal Bureau of Investigation (FBI)

Type text here

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 5, 2023

*M. David Weisman*

*Judge's signature*

City and state: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, BRENT E. POTTER, being duly sworn, state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI"), assigned to the Chicago Field Office.  I have been employed by the FBI as a Special Agent for over 26 years, during which time I have conducted numerous financial fraud investigations.  I am currently assigned to an FBI squad dedicated to the investigation of federal wire and mail fraud offenses, as well as related financial crimes.

2.      This affidavit is submitted in support of the attached criminal complaint.  The information contained in this affidavit is based upon my personal knowledge, as well as information provided to me by other law enforcement officers. It is also based upon my review of subpoenaed records, records obtained without the use of a grand jury subpoena, and on information provided to me by non-law enforcement personnel.  Because this affidavit is submitted for the limited purpose of establishing probable cause with regard to the attached criminal complaint, it does not set forth each fact that I have learned during this investigation.

3.      As explained in more detail below, in or around November 2022, the FBI began investigating whether SHAUNTELLE PRIDGEON and others were participating in an honest-services fraud scheme.  In approximately August 2022,

PRIDGEON became the subject of an investigation by the Office of Inspector General of DCFS ("DCFS-OIG"), and the Illinois State Police subsequently joined the investigation. Based on information from the DCFS-OIG, the Illinois State Police and other sources, the FBI has learned that PRIDGEON was employed as a Social Service Community Planner with the Illinois Department of Children and Family Services ("DCFS") from approximately 2015 through the present, and PRIDGEON's employment responsibilities at DCFS included the review and approval of daycare providers for children under DCFS' supervision. The DCFS-OIG initiated its investigation of PRIDGEON based upon a complaint from her DCFS supervisor, Individual A. According to Individual A, on or about August 16, 2022, Individual A learned that in 2019 PRIDGEON had approved a childcare provider—referred to here as PROVIDER A—for certain children in foster-care under the supervision of DCFS and that DCFS had subsequently paid approximately $280,000 over a period of several years to PROVIDER A as compensation for childcare services that were not actually performed. On or about August 16, 2022, when Individual A discovered the payments to PROVIDER A, PRIDGEON was placed on administrative leave by DCFS. According to Individual A, PRIDGEON has continued to be on administrative leave up through the present date.

4.      After beginning their investigation, DCFS-OIG and the Illinois State Police notified the FBI of PRIDGEON's conduct, and the FBI joined the investigation. Based upon my preliminary examination of records of PRIDGEON's bank accounts, PRIDGEON received at least $1.6 million in payments from at least 2016 through

2022 from at least 14 separate childcare providers doing business with DCFS.  These payments to PRIDGEON were made to a bank account on which PRIDGEON and her spouse were the sole signers, and the payments took the form of electronic transfers and checks.  Most of these personal payments to PRIDGEON were made by the providers at the same time that those providers were being paid for childcare services by DCFS.  Neither the providers nor PRIDGEON ever disclosed these payments to DCFS or the State of Illinois, as required by Illinois state statute.

5.    The attached criminal complaint alleges that, from no later than January 1, 2017 and continuing through at least August 16, 2022, SHAUNTELE PRIDGEON devised or intended to devise a scheme or artifice to defraud, including a scheme or artifice to deprive PRIDGEON's employer, the State of Illinois, of the intangible right of honest services, and transmitted or caused to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme or artifice data in furtherance of an automated clearinghouse electronic funds transfer from the State of Illinois to a "ghost provider," in violation of Title 18, United States Code, §§ 1343 and 1346.

## FACTS ESTABLISHING PROBABLE CAUSE

### A. BACKGROUND

6.    The Illinois DCFS is a cabinet level agency of the government of the State of Illinois.  The mission statement of DCFS is to "protect children who are reported to be abused or neglected and to increase their families' capacity to

safely care for them; to provide for the well-being of children in the care of DCFS; provide appropriate, permanent families as quickly as possible for those children who cannot safely return home; support early intervention and child abuse prevention activities and work in partnerships with communities to fulfill this mission." Among DCFS' responsibilities is to pay childcare providers who provide services to children under the supervision of DCFS. Generally, these childcare providers are paid monthly by DCFS, and the amount of their pay is dependent on how many days they provided childcare services to children in foster care and the number of such children in their care.

7. Children who are temporarily removed from the custody of their parents by DCFS and placed in the care of adults approved by DCFS are known as children in foster care, or simply "foster children." The adults caring for such children are generally known as foster parents. Foster parents must often work outside their home and therefore they engage childcare providers for their foster children while they are at work. DCFS is authorized to pay those childcare providers at certain rates set by the agency, depending on factors including the skill or licensing level of the childcare provider and the age of the child.

8. The Office of the DCFS-OIG is an Illinois state government entity within DCFS and its function is to investigate misconduct, misfeasance, malfeasance and violations of rules, procedures or laws by DCFS employees, foster parents, service providers and contractors with the department. To that

end, DCFS-OIG undertakes investigations in response to complaints by the general public or from DCFS employees. Its activities are governed by Illinois state laws, including Chapter 20 of the Illinois Consolidated Statutes, §§ 505/35.5, 35.6, and 35.7.

9. SHAUNTELE PRIDGEON was employed by DCFS as a Social Service Community Planner from approximately 2015 through August 2022. PRIDGEON generally worked out of the DCFS offices located at 1911 and 1921 South Indiana Avenue in Chicago, Illinois. Among PRIDGEON's duties were to make childcare eligibility determinations for children in foster care. PRIDGEON was responsible for reviewing applications by childcare providers and approving those childcare providers for specific children in foster care and setting the rates at which those childcare providers would be paid by DCFS, in accordance with existing DCFS policies and procedures. She was one of two Social Service Community Planners who performed this function for DCFS in the Chicago area. PRIDGEON and the other Social Service Community Planner generally split this task between them alphabetically, with PRIDGEON handling cases for foster parents with last names beginning from A to N. PRIDGEON was under the direct supervision of Individual A, a Public Service Administrator employed by DCFS who also worked at the DCFS offices located at 1911 and 1921 South Indiana Avenue in Chicago.

10.   As noted above, according to Individual A, one of PRIDGEON's duties was to review and approve childcare providers for specific children in foster care.  To do this, she received written applications to approve a childcare provider from the foster parents and their assigned DCFS case worker.  If the childcare provider had not already been approved by DCFS and assigned a Provider identification number, PRIDGEON was responsible for requesting a background check of the provider in order to ensure that they had no record of criminal convictions for violent crimes or past substantiated complaints of child abuse or neglect.  If PRIDGEON received an application for a provider that had already been registered by DCFS, she was required to determine whether that provider was a suitable provider for that specific child in foster care.  PRIDGEON was responsible for re-examining the suitability of childcare providers for all foster children that she supervised every six months and re-approving those providers if they were suitable.  This was done electronically by PRIDGEON within the DCFS computer system.

11.   PRIDGEON also had the responsibility and authority to create new DCFS Provider identification numbers for childcare providers that she had approved.  Each childcare provider in the DCFS computer system is assigned a unique Provider identification number.  PRIDGEON also had the authority to set the pay rate for that childcare provider in the DCFS computer system.  PRIDGEON was supposed to set these pay rates in accordance with DCFS policies and procedures.  Generally, unlicensed childcare providers, who were often friends or family members of the foster parents, once approved, were

supposed to be paid by DCFS at the lowest rates – between about $11 and $22 per day. Licensed or qualified license exempt childcare providers could be paid at significantly higher rates of up to approximately $50 per day.

12.     Generally, approved childcare providers seeking payment from DCFS for childcare services rendered during the course of a calendar month receive a Monthly Enrollment Form from DCFS each month. The Monthly Enrollment Form, also known as a "bill," has the name of each approved foster child assigned to that care provider as well as the pay rates that the provider will receive per day for each individual foster child. The provider is responsible for filling in the number of days during the month that they provided childcare services for each child listed on the bill, signing the form, and returning the form to DCFS via mail, hand-delivery, or e-mail. The completed and signed bill is used by DCFS to approve monthly payments to the provider, and the total amount to be paid to the provider is then submitted by DCFS to the State of Illinois Comptroller for payment.

**B. DCFS-OIG COMMENCES ITS INVESTIGATION**

13.     As noted above in paragraph 3, the FBI first began investigating the activities of SHAUNTELE PRIDGEON in November 2022 at the request of DCFS-OIG and the Illinois State Police. DCFS-OIG began their internal investigation of PRIDGEON in or around August 2022 at the request of Individual A, PRIDGEON's direct supervisor.

14.     After DCFS-OIG received the information from Individual A and began an investigation of PRIDGEON's activities, DCFS-OIG preserved the contents of PRIDGEON's official DCFS e-mail account, as well as various papers and documents found at PRIDGEON's workspace in the DCFS office.  DCFS-OIG and I have conducted a preliminary review of some e-mails contained within PRIDGEON's official DCFS e-mail account.

## C. INTERVIEW OF INDIVIDUAL A

15.     I interviewed Individual A on March 31, 2023.  According to Individual A, she scheduled a meeting with PRIDGEON and other DCFS employees which took place on or about August 16, 2022.  The purpose of the meeting was to discuss an overpayment by DCFS to a childcare provider referred to here as PROVIDER A.  PRIDGEON had initially approved PROVIDER A as a childcare provider by on or about September 13, 2019.  Following PRIDGEON's approval of PROVIDER A, DCFS issued payments to PROVIDER A for purportedly providing childcare to several foster children between approximately 2019 through 2022.  Individual B, who was the other Social Service Community Planner responsible for childcare eligibility determinations and approvals of childcare providers, had previously reported PRIDGEON to Individual A for approving overpayments of DCFS funds to PROVIDER A.  Individual B had seen documents indicating that PROVIDER A served as the childcare provider for certain children in foster care.  Individual B learned that PROVIDER A did not actually provide childcare for those children because she was the one who actually handled childcare approvals and authorizations

for those specific children. According to Individual A, Individuals A and B subsequently looked into PROVIDER A within DCFS records and found that DCFS had overpaid PROVIDER A by thousands of dollars for either childcare that it did not actually provide, or at pay rates that were substantially higher than what was authorized by DCFS. In addition, Individual A noted there was no childcare business located at the Chicago address listed in DCFS's records for PROVIDER A on West 71st Street . Instead, a beauty salon was located at that address, and behind the beauty salon was an apartment above a garage.

16.     In addition, Individuals A and B researched Individual C, one of the co-managers of PROVIDER A as listed in the records of the Illinois Secretary of State. They found that Individual C was personally registered with DCFS as a childcare provider and had been paid by DCFS to provide childcare for numerous children in foster care. Individuals A and B also found that Individual C was overpaid by DCFS because she had billed DCFS for numerous children to whom she could not have provided childcare services, because other legitimate childcare providers had in fact provided childcare services to those children.

17.     According to the records of the Illinois Secretary of State, PROVIDER A was incorporated in the State of Illinois on or about June 25, 2019, using the Chicago address on West 71st Street, Chicago, Illinois. Individual C, a resident of Chicago, was listed as one of the two managers of PROVIDER A in the Illinois Secretary of State records. According to DCFS records that I have examined, PRIDGEON

approved PROVIDER A as a childcare provider and assigned it a new DCFS Provider ID number on or about September 13, 2019, a little over two months after its incorporation. I have physically observed the address listed for PROVIDER A on or about April 1, 2023. There is no childcare business located there, and instead there is only a beauty salon at that location, and behind the beauty salon is an apartment above a garage.

18. For the meeting on August 16, 2022, Individual A had asked PRIDGEON to bring DCFS files related to PROVIDER A and the foster parents supposedly served by PROVIDER A, and Individual A asked PRIDGEON to be prepared to explain how the overpayments of DCFS funds to PROVIDER A was allowed to happen. PRIDGEON came to the meeting without the files and told Individual A that she could not find them. Individual A then directed an Office Associate to go to the DCFS file room in the building and obtain the files, which he did a short time later. After the Office Associate left to get the files, PRIDGEON excused herself to go to the restroom. According to Individual A, PRIDGEON then entered the file room, took the files away from the Office Associate who was holding them, and left the room. Individual A said that other DCFS employees subsequently saw PRIDGEON in various places in the DCFS building.

19. I interviewed one such employee on March 31, 2023, whose initials were "CJ." She told me that she saw PRIDGEON at the elevator in the DCFS building around the time that PRIDGEON had taken the files from the Office Associate.

PRIDGEON had several files in her possession when CJ saw her. PRIDGEON said to her "[CJ], I fucked up."

20.     Individual A's Office Associate later saw PRIDGEON in the DCFS building and escorted her back to Individual A's office. According to Individual A, PRIDGEON had the files in her custody at that time, but they were largely empty of documents, and Individual A suspected that PRIDGEON had disposed of documents from the files in confidential trash bins located throughout the DCFS office.

21.     At that time, PRIDGEON told Individual A that PROVIDER A was a legitimate childcare provider, and PRIDGEON offered as proof a Google Maps street view printed photograph of the building at the address attributed to PROVIDER A. However, according to Individual A, the photograph showed a beauty salon rather than a childcare provider at the address attributed to PROVIDER A in DCFS' records. There was a childcare business adjacent to PROVIDER A's address and PRIDGEON claimed to Individual A that this childcare business was PROVIDER A. Individual A, with PRIDGEON still in her office, called this childcare business and inquired whether they were affiliated with PROVIDER A. According to Individual A, the childcare business denied any affiliation with PROVIDER A.

22.     Based on the series of events described above and the information provided by the legitimate childcare provider located near the purported location of PROVIDER A, Individual A concluded that PROVIDER A was a "ghost provider" and that PRIDGEON had been committing fraud. While PRIDGEON remained in her

office, Individual A began typing an e-mail to the DCFS Licensing section in which she requested an investigation of PROVIDER A because there were indications that it was not a legitimate childcare business. Individual A told PRIDGEON that she was requesting a DCFS investigation of PROVIDER A and that "it appeared as though someone had been committing fraud." Individual A told me that PRIDGEON then began to cry and was upset.

23.    According to Individual A, she also alerted her supervisors at DCFS to PRIDGEON's conduct. Shortly thereafter, PRIDGEON was served by a DCFS Senior Public Service Administrator with a letter placing her on immediate administrative leave. According to Individual A, the DCFS Senior Public Service Administrator notified Individual A that he/she had observed PRIDGEON dumping papers into a confidential trash bin in the DCFS building, which prompted Individual A to personally escort PRIDGEON from the DCFS building. Individual A then returned to the confidential trash bin and observed that the documents PRIDGEON had placed in the bin included printouts bearing the names of numerous DCFS childcare providers who had been "inactivated" by PRIDGEON in DCFS' computer system as approved providers for certain children in foster care. The date on these printouts was August 16, 2022. Individual A told me that she believed these printouts were an attempt by PRIDGEON to remove evidence of fraudulent provider payments by inactivating those providers in DCFS' system.

24.     After she physically removed PRIDGEON from the DCFS office, she called Individual C.  Individual A told Individual C that she should not be receiving funds from DCFS for many of the foster children for whom she had claimed to provide childcare in monthly bills that she sent to DCFS.  Individual C sounded nervous on the phone and told Individual A that she was just doing what PRIDGEON had told her to do.  Individual C said that she needed to talk to PRIDGEON and hung up the phone.  Individual C has not responded to subsequent attempts by Individual A to contact her by phone.

### D. INDIVIDUAL C

25.     According to the records of DCFS, Individual C has been registered as a childcare provider since at least January 2016, and from that time through February 2023, she has been paid in excess of $1 million by DCFS for childcare provided to foster children.  In addition, Individual C was in frequent contact via e-mail with PRIDGEON from at least May 2017 through February 2022.  Individual C often sent e-mails to PRIDGEON with attachments consisting of bills listing childcare services provided by herself or third parties, including PROVIDER A. One such e-mail sent by Individual C on or about December 23, 2019 had as attachments two bills from PROVIDER A.  These two bills listed childcare services as having been performed by PROVIDER A for 12 children and requested payment from DCFS in the total amount of approximately $7,871 for the period of October to November 2019.

26.     PRIDGEON also e-mailed to Individual C at least two bills listing PROVIDER A as a childcare provider.  The first such bill covered the month of July 2020, listing nine children with billing rates of approximately $31 per day to $44 per day.  The second such bill covered the month of December 2020, listing seven children, each with a billing rate of $33 per day.  These bills were not signed or filled in, which indicated to me, based on my training and experience and knowledge of the investigation, that PRIDGEON expected Individual C to complete the bills, sign them, and return them to DCFS for payment.

## E.  PAYMENTS TO PRIDGEON FROM CHILDCARE PROVIDERS

27.     As part of my investigation, I obtained the personal and business banking records of PRIDGEON through the service of a federal grand jury subpoena. I have conducted a preliminary review of those bank records and found that PRIDGEON owned a Sole Proprietorship business bank account under the name M&S ENTERPRISES.  PRIDGEON opened this bank account at Financial Institution A on or about February 11, 2009.  PRIDGEON and her husband are the sole signers on this account.  The Illinois Secretary of State had no record of incorporation for M&S ENTERPRISES, and, according to searches of public records databases that I have run, the Tax Identification Number submitted by PRIDGEON to Financial Institution A was not a valid tax identification number.

28.     Between approximately July 2016 through August 2022, PRIDGEON's M&S ENTERPRISES bank account received approximately $1.6 million in payments,

in the form of numerous electronic transfers and personal checks, from at least 12 different individuals who were registered with DCFS as childcare providers. These DCFS registered childcare providers whose money was received in this bank account also were receiving payments from DCFS for the care of foster children during the time frame that they were making payments to PRIDGEON. Individual C was among these providers who paid PRIDGEON. The payments from these childcare providers were not disclosed to DCFS or the State of Illinois by either PRIDGEON or the childcare providers.

29. As part of my investigation, I have also obtained and analyzed preliminary financial information from DCFS-OIG and the State of Illinois Comptroller about the amounts and dates of payments made by DCFS to the childcare providers noted above in paragraph 28.

30. Many payments from DCFS to the individual childcare providers appeared to be correlated in time and amount to those providers' payments to PRIDGEON. For example, Provider A made electronic bank transfers to PRIDGEON during approximately 63 months between August 2016 through February 2022 and Provider A was paid by DCFS for childcare services during approximately 55 of those months. In addition, Provider A often paid PRIDGEON exactly half of what DCFS paid Provider A within days of receiving the DCFS payments. For example, Provider A was paid approximately $6,204 by DCFS on or about March 6, 2020. Between March 10 and March 11, 2020, Provider A sent two electronic funds transfers to

PRDIGEON's M&S ENTERPRISES bank account totaling $3,102, which is half of what DCFS paid to Provider A. The very next month, Provider A was paid approximately $7,376 by DCFS on or about April 7, 2020, followed by two electronic transfers from Provider A to PRIDGEON between April 9 and April 10, 2020 totaling $3,688. This is, once again, half of the amount paid by DCFS to Provider A just days earlier. This pattern of paying PRIDGEON almost exactly half of what Provider A received from DCFS was repeated in approximately 18 of the following months, until February 2022.

31.     In the case of Provider B, his first electronic transfer to PRIDGEON's M&S ENTERPRISES bank account took place days after he received his first childcare payment from DCFS. Provider B received his first payment from DCFS on or about October 5, 2021, followed by a second payment on or about October 27, 2021, totaling approximately $30,140. Provider B made his first electronic funds transfer to PRIDGEON's bank account on or about October 15, 2021, followed by two others on or about October 18 and October 22, 2021, for a total payment to PRIDGEON of approximately $10,500. DCFS continued paying Provider B for childcare services through approximately January 25, 2022 and Provider B continued making electronic transfers to PRIDGEON's bank account until approximately February 18, 2022.

32.     Individual C paid PRIDGEON in excess of $244,000 via electronic funds transfers to the M&S ENTERPRISES bank account between approximately July 2016 and June 2022. Many of these transfers took place during the time frame when

PROVIDER A was receiving payments from DCFS for foster childcare from approximately October 29, 2019 through March 4, 2022. Individual C was also receiving payments for childcare services from DCFS during the time that she was paying PRIDGEON thousands of dollars a month. For example, on or about December 29, 2020, PRIDGEON e-mailed to Individual C a copy of a bill for PROVIDER A covering the month of December 2020. This bill listed seven children in the care of PROVIDER A at a daily rate of $33 each. On the same day, PRIDGEON e-mailed to Individual C a copy of a bill for Individual C covering the month of December 2020. This bill listed thirteen children in the care of Individual C with daily billing rates between approximately $33 and $39 each. These bills were not yet filled out by the provider. PROVIDER A was subsequently paid approximately $5,082 by DCFS on or about January 27, 2021, and Individual C was paid approximately $11,431 by DCFS on or about January 14, 2021. Individual C subsequently paid PRIDGEON via four electronic transfers to the M&S ENTERPRISES bank account on or about February 16, 18, 23 and 24, 2021 in the total amount of $10,500.

33.     In another example, PRIDGEON e-mailed two bills to Individual C on or about December 2, 2021. The two bills were issued by DCFS to Individual C and PROVIDER A. DCFS records showed that PRIDGEON generated these bills from DCFS' computer system the same day that she sent them to Individual C. The PROVIDER A bill covered the month of November 2021 and listed 13 children at daily rates of $35 each. The bill issued to Individual C listed 11 children at daily rates of

approximately $36 to $42 each. These bills were not yet filled out or signed by the provider. PROVIDER A was subsequently paid approximately $9,555 on or about December 27, 2021, and Individual C was paid approximately $17,129 on or about January 5, 2022. PRIDGEON subsequently received three separate electronic funds transfers from Individual C on or about January 7, 28 and 31, 2022 totaling $9,000.

### F. PRIDGEON KNEW THAT ACCEPTING BRIBES WAS ILLEGAL

34.     As a condition of her employment by DCFS, PRIDGEON was required to receive annual ethics training for State of Illinois employees, and I have reviewed her training transcript as maintained by DCFS. PRIDGEON's transcript showed that she completed the required Illinois ethics training course every year between 2019 and 2022.   I have reviewed part of the content of the Illinois ethics training course that deals with conflicts of interest, gifts and bribery. The course had a section entitled "The Gift Ban." The course defined a gift as generally any tangible or intangible thing that has monetary value. This definition of gifts set forth in the annual Illinois ethics training clearly includes payments of money. According to this section,

> *"People and companies who are hoping that state government will decide to take or not take a certain action may try to gain favor with government officials like you. They may do this by offering you gifts. As a state employee, you (and some family members) may not ask for*

*or accept a gift from a prohibited source. Prohibited sources are*

*people or companies that:*

- *seek an official action from you, the employees you direct, or your state agency;*

- *do business with or seek to do business with the State of Illinois or your state agency;*

- *participate in activities regulated by you, the employees you direct, or your state agency;*

- *have interests that you may substantially affect by performing (or not performing) your official duties"*

35.     All of the childcare providers paid by DCFS for services rendered to foster parents and children fall within the course's definition of "prohibited sources" from which state employees may not accept or solicit gifts.  In addition to the Illinois Gift Ban, the next section of the ethics course dealt with the concept of official misconduct.  The course stated that "accepting a bribe in exchange for performing an official act is a type of official misconduct."  It went on to elaborate "State employees commit official misconduct when, in their official capacity, they … solicit or accept a bribe."  The course further defined official misconduct as a Class Three felony offense in Illinois which could also result in the forfeiture of state employment.

## G. PRIDGEON GAMBLED EXTENSIVELY WHILE ACCEPTING PAYMENTS FROM CHILDCARE PROVIDERS

36.     I have obtained records from Casino A, which is located in the metropolitan Chicago area, pursuant to service of a federal grand jury subpoena and

I have conducted a preliminary analysis of the records. The records showed that PRIDGEON gambled extensively at Casino A from approximately January 2015 through November 2022, primarily playing slots machines. The records indicated that PRIDGEON had a net cash intake at the casino of approximately $3.9 million and a net cash withdrawal of approximately $1.7 million. As no significant value was on PRIDGEON's accounts at the casino when the records were produced in January 2023, this reflects a net gambling loss of approximately $2.2 million during that same time frame. Based upon my review of PRIDGEON's M&S ENTERPRISES bank account, she often paid her gambling related expenses from this account, using the payments made by the childcare providers as described above.

## J.  USE OF INTERSTATE WIRE COMMUNICATIONS

37.    On April 6, 2023, I received information from Individual D, an employee of the State of Illinois Comptroller. According to Individual D, the Comptroller remits payment to providers through two means, according to their request. The first is by official check, which is sent via United States Mail to the provider's address. The second means by which payment is made by the Comptroller is via direct deposit to the provider's bank account. According to Individual D, direct deposit is made by the Comptroller using the Federal Reserve's "FedACH" system. Based upon my training and experience, I know that FedACH employs a computer data center located in New Jersey to make its transactions. Since the Comptroller initiates direct deposits electronically from its facilities located in the State of Illinois, a direct deposit payment made by the

Comptroller results in an interstate wire transmission from Illinois to New Jersey.

### K.  VIOLATIONS OF 18 U.S.C. §§ 1343 and 1346

38.    Based upon my training and experience, as well as my preliminary examination of PRIDGEON's financial records and the financial information provided by DCFS and the State of Illinois Comptroller, as well as the information provided by Individual A, I believe that PRIDGEON accepted bribes from numerous childcare providers, including Individual C.  Based upon the foregoing, I further believe that she accepted these bribes in her official capacity as a DCFS Social Service Community Planner in exchange for her favorable consideration of their applications for approval as childcare providers to children in foster care, as well as for her approval of payment requests to DCFS by those childcare providers.  Moreover, PRIDGEON annually completed the state's annual ethics course and so was well aware that accepting such bribes in exchange for official acts was prohibited by her employer and illegal.  I respectfully submit that there is probable cause to believe that, in so doing, PRIDGEON engaged in a scheme or artifice to defraud the State of Illinois of the intangible right to honest services in her employment, in violation of 18 USC § 1346.

39.    As part of this scheme or artifice to defraud the State of Illinois, PRIDGEON caused to be transmitted by means of wire communication in interstate commerce data in furtherance of a FedACH payment of approximately $9,555 from

the State of Illinois Comptroller on or about December 27, 2021, to a bank account in the name of PROVIDER A, in violation of 18 USC § 1343.

## **CONCLUSION**

40.     Based upon the information set forth above, I submit that there is probable cause to believe that, beginning no later than January 1, 2017, and continuing until at least August 16, 2022, SHAUNTELE PRIDGEON devised or intended to devise a scheme or artifice to defraud, including a scheme or artifice to deprive PRIDGEON's employer, the State of Illinois, of the intangible right of honest services, and transmitted or caused to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme or artifice data in furtherance of an automated clearinghouse electronic funds transfer in the amount of approximately $9,555 on or about December 27, 2021, from the State of Illinois to a bank account in the name of PROVIDER A, in violation of Title 18, United States Code, §§ 1343 and 1346.


FURTHER AFFIANT SAYETH NOT.

/s/ Brent E. Potter (MDW with permission)

BRENT E. POTTER
Special Agent,
Federal Bureau of Investigation


SWORN TO AND AFFIRMED by telephone May 5, 2023.

_M. David Weisman_

Honorable M. DAVID WEISMAN
United States Magistrate Judge